# PENNSYLVANIA *v.* RITCHIE

No. 85–1347.   Argued December 3, 1986—Decided February 24, 1987

40

POWELL, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–B, III–C, and IV, in which REHNQUIST, C. J., and WHITE, BLACKMUN, and O'CONNOR, JJ., joined, and an opinion with respect to Part III–A, in which REHNQUIST, C. J., and WHITE and O'CONNOR, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 61. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined,

post, p. 66. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and SCALIA, JJ., joined, post, p. 72.

*Edward Marcus Clark* argued the cause for petitioner. With him on the briefs was *Robert L. Eberhardt.*

*John H. Corbett, Jr.,* by invitation of the Court, 478 U. S. 1019, argued the cause and filed a brief as *amicus curiae* in support of the judgment below. With him on the brief was *Lester G. Nauhaus.**

JUSTICE POWELL announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–B, III–C, and IV, and an opinion with respect to Part III–A, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join.

The question presented in this case is whether and to what extent a State's interest in the confidentiality of its investiga-

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General, *Steve White,* Chief Assistant Attorney General, *Arnold Overoye,* Assistant Attorney General, *Joel Carey,* Supervising Deputy Attorney General, and *Karen Ziskind,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Duane Woodard* of Colorado, *Joseph Lieberman* of Connecticut, *Corinne Watanabe,* Acting Attorney General of Hawaii, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *David Armstrong* of Kentucky, *William J. Guste, Jr.,* of Louisiana, *James E. Tierney* of Maine, *Hubert H. Humphrey III* of Minnesota, *Edwin L. Pittman* of Mississippi, *Michael Greely* of Montana, *Stephen E. Merrill* of New Hampshire, *Lacy H. Thornburg* of North Carolina, *Mike Turpen* of Oklahoma, *LeRoy S. Zimmerman* of Pennsylvania, *Mike Cody* of Tennessee, *David L. Wilkinson* of Utah, *Jeffrey L. Amestoy* of Vermont, *William A. Broadus* of Virginia, *Kenneth O. Eikenberry* of Washington, *Charlie Brown* of West Virginia, and *Archie G. McClintock* of Wyoming; for the County of Allegheny, Pennsylvania, on behalf of Allegheny County Children and Youth Services by *George M. Janocsko* and *Robert L. McTiernan;* for the Appellate Committee of the District Attorneys Association of California by *Ira Reiner, Harry B. Sondheim,* and *Arnold T. Guminski;* for the Pennsylvania Coalition Against Rape et al. by *Nancy D. Wasser;* and for the Sunny von Bulow National Victim Advocacy Center, Inc., et al. by *Frank Gamble Carrington, Jr., David Crump,* and *Ann M. Haralambie.*

tive files concerning child abuse must yield to a criminal defendant's Sixth and Fourteenth Amendment right to discover favorable evidence.

I

As part of its efforts to combat child abuse, the Commonwealth of Pennsylvania has established Children and Youth Services (CYS), a protective service agency charged with investigating cases of suspected mistreatment and neglect. In 1979, respondent George Ritchie was charged with rape, involuntary deviate sexual intercourse, incest, and corruption of a minor. The victim of the alleged attacks was his 13-year-old daughter, who claimed that she had been assaulted by Ritchie two or three times per week during the previous four years. The girl reported the incidents to the police, and the matter then was referred to the CYS.

During pretrial discovery, Ritchie served CYS with a subpoena, seeking access to the records concerning the daughter. Ritchie requested disclosure of the file related to the immediate charges, as well as certain records that he claimed were compiled in 1978, when CYS investigated a separate report by an unidentified source that Ritchie's children were being abused.[1] CYS refused to comply with the subpoena, claiming that the records were privileged under Pennsylvania law. The relevant statute provides that all reports and other information obtained in the course of a CYS investigation must be kept confidential, subject to 11 specific exceptions.[2] One of those exceptions is that the agency may

---

[1] Although the 1978 investigation took place during the period that the daughter claimed she was being molested, it is undisputed that the daughter did not tell CYS about the assaults at that time. No criminal charges were filed as a result of this earlier investigation.

[2] The statute provides in part:

"(a) Except as provided in section 14 [Pa. Stat. Ann., Tit. 11, § 2214 (Purdon Supp. 1986)], reports made pursuant to this act including but not limited to report summaries of child abuse . . . and written reports . . . as well as any other information obtained, reports written or photographs or X-rays taken concerning alleged instances of child abuse in the possession

disclose the reports to a "court of competent jurisdiction pursuant to a court order." Pa. Stat. Ann., Tit. 11, § 2215(a)(5) (Purdon Supp. 1986).

Ritchie moved to have CYS sanctioned for failing to honor the subpoena, and the trial court held a hearing on the motion in chambers. Ritchie argued that he was entitled to the information because the file might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence. He also requested disclosure of a medical report that he believed was compiled during the 1978 CYS investigation. Although the trial judge acknowledged that he had not examined the entire CYS file, he accepted a CYS representative's assertion that there was no medical report in the record.[3] The judge then denied the motion and refused to order CYS to disclose the files.[4] See App. 72a.

At trial, the main witness against Ritchie was his daughter. In an attempt to rebut her testimony, defense counsel

of the department, a county children and youth social service agency or a child protective service shall be confidential and shall only be made available to:

. . . . .

"(5) A court of competent jurisdiction pursuant to a court order." Pa. Stat. Ann., Tit. 11, § 2215(a) (Purdon Supp. 1986).

At the time of trial the statute only provided five exceptions to the general rule of confidentiality, including the exception for court-ordered disclosure. The statute was amended in 1982 to increase the number of exceptions. For example, the records now may be revealed to law enforcement officials for use in criminal investigations. § 2215(a)(9). But, the identity of a person who reported the abuse or who cooperated in the investigation may not be released if the disclosure would be detrimental to that person's safety. § 2215(c).

[3] The trial judge stated that he did not read "50 pages or more of an extensive record." App. 72a. The judge had no knowledge of the case before the pretrial hearing. See id., at 68a.

[4] There is no suggestion that the Commonwealth's prosecutor was given access to the file at any point in the proceedings, or that he was aware of its contents.

cross-examined the girl at length, questioning her on all aspects of the alleged attacks and her reasons for not reporting the incidents sooner.   Except for routine evidentiary rulings, the trial judge placed no limitation on the scope of cross-examination.   At the close of trial Ritchie was convicted by a jury on all counts, and the judge sentenced him to 3 to 10 years in prison.

On appeal to the Pennsylvania Superior Court, Ritchie claimed, *inter alia*, that the failure to disclose the contents of the CYS file violated the Confrontation Clause of the Sixth Amendment, as applied to the States through the Due Process Clause of the Fourteenth Amendment.[5]   The court agreed that there had been a constitutional violation, and accordingly vacated the conviction and remanded for further proceedings.   324 Pa. Super. 557, 472 A. 2d 220 (1984).   The Superior Court ruled, however, that the right of confrontation did not entitle Ritchie to the full disclosure that he sought.   It held that on remand, the trial judge first was to examine the confidential material *in camera,* and release only the verbatim statements made by the daughter to the CYS counselor.   But the full record then was to be made available to Ritchie's lawyer, for the limited purpose of allowing him to argue the relevance of the statements.   The court stated that the prosecutor also should be allowed to argue that the failure to disclose the statements was harmless error.   If the trial judge determined that the lack of information was preju-

---

[5] The Sixth Amendment of the United States Constitution protects both the right of confrontation and the right of compulsory process:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor."

Both Clauses are made obligatory on the States by the Fourteenth Amendment.   *Pointer* v. *Texas,* 380 U. S. 400, 403–406 (1965) (Confrontation Clause); *Washington* v. *Texas,* 388 U. S. 14, 17–19 (1967) (Compulsory Process Clause).

dicial, Ritchie would be entitled to a new trial. *Id.*, at 567–568, 472 A. 2d, at 226.

On appeal by the Commonwealth, the Supreme Court of Pennsylvania agreed that the conviction must be vacated and the case remanded to determine if a new trial is necessary. 509 Pa. 357, 502 A. 2d 148 (1985). But the court did not agree that the search for material evidence must be limited to the daughter's verbatim statements. Rather, it concluded that Ritchie, through his lawyer, is entitled to review the entire file to search for any useful evidence.[6] It stated: "When materials gathered become an arrow of inculpation, the person inculpated has a fundamental constitutional right to examine the provenance of the arrow and he who aims it." *Id.*, at 367, 502 A. 2d, at 153. The Pennsylvania Court concluded that by denying access to the file, the trial court order had violated both the Confrontation Clause and the Compulsory Process Clause. The court was unpersuaded by the Commonwealth's argument that the trial judge already had examined the file and determined that it contained no relevant information. It ruled that the constitutional infirmity in the trial court's order was that Ritchie was unlawfully denied the opportunity to have the records reviewed by "the eyes and the perspective of an advocate," who may see relevance in places that a neutral judge would not. *Ibid.*

In light of the substantial and conflicting interests held by the Commonwealth and Ritchie, we granted certiorari. 476 U. S. 1139 (1986). We now affirm in part, reverse in part, and remand for proceedings not inconsistent with this opinion.

---

[6] The court noted that the trial court should take "appropriate steps" to guard against improper dissemination of the confidential material, including, for example, "fashioning of appropriate protective orders, or conducting certain proceedings *in camera.*" 509 Pa., at 368, n. 16, 502 A. 2d, at 153, n. 16. These steps were to be taken, however, subject to "the right of [Ritchie], through his counsel, to gain access to the information." *Ibid.*

## II

Before turning to the constitutional questions, we first must address Ritchie's claim that the Court lacks jurisdiction, because the decision below is not a "final judgment or decree." See 28 U. S. C. § 1257(3); *Market Street R. Co.* v. *Railroad Comm'n of California,* 324 U. S. 548, 551 (1945). Normally the finality doctrine contained in § 1257(3) is not satisfied if the state courts still must conduct further substantive proceedings before the rights of the parties as to the federal issues are resolved. *Ibid.; Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120, 123–127 (1945). Ritchie argues that under this standard the case is not final, because there are several more proceedings scheduled in the Pennsylvania courts: at a minimum there will be an *in camera* review of the file, and the parties will present arguments on whether the lack of disclosure was prejudicial; after that, there could be a new trial on the merits. Ritchie claims that because the Sixth Amendment issue may become moot at either of these stages, we should decline review until these further proceedings are completed.

Although it is true that this Court is without jurisdiction to review an interlocutory judgment, it also is true that the principles of finality have not been construed rigidly. As we recognized in *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975), there are at least four categories of cases in which jurisdiction is proper even when there are further proceedings anticipated in the state court. One of these exceptions states that the Court may consider cases:

> "[W]here the federal claim has been finally decided, with further proceedings on the merits in the state courts to come, but in which later review of the federal issue cannot be had, whatever the ultimate outcome of the case. . . . [I]n these cases, if the party seeking interim review ultimately prevails on the merits, the federal issue will be mooted; if he were to lose on the merits, however, the

governing state law would not permit him again to present his federal claims for review." *Id.*, at 481.

We find that the case before us satisfies this standard because the Sixth Amendment issue will not survive for this Court to review, regardless of the outcome of the proceedings on remand. If the trial court decides that the CYS files do not contain relevant information, or that the nondisclosure was harmless, the Commonwealth will have prevailed and will have no basis to seek review. In this situation Ritchie's conviction will be reinstated, and the issue of whether defense counsel should have been given access will be moot. Should Ritchie appeal the trial court's decision, the Commonwealth's only method for preserving the constitutional issue would be by cross-claims. Thus the only way that *this* Court will be able to reach the Sixth Amendment issue is if Ritchie eventually files a petition for certiorari on the trial court's adverse ruling, and the Commonwealth files a cross-petition. When a case is in this procedural posture, we have considered it sufficiently final to justify review. See, *e. g., New York* v. *Quarles*, 467 U. S. 649, 651, n. 1 (1984); *South Dakota* v. *Neville,* 459 U. S. 553, 558, n. 6 (1983).

Alternatively, if Ritchie is found to have been prejudiced by the withholding and is granted a new trial, the Commonwealth still will be unable to obtain a ruling from this Court. On retrial Ritchie either will be convicted, in which case the Commonwealth's ability to obtain review again will rest on Ritchie's willingness to appeal; or he will be acquitted, in which case the Commonwealth will be barred from seeking review by the Double Jeopardy Clause. See *ibid.; California* v. *Stewart,* 384 U. S. 436, 498, n. 71 (1966) (decided with *Miranda* v. *Arizona,* 384 U. S. 436 (1966)). Therefore, if this Court does not consider the constitutional claims now, there may well be no opportunity to do so in the future.[7]

---

[7] As JUSTICE STEVENS' dissent points out, *post,* at 74, there is a third possibility. If the trial court finds prejudicial error and orders a retrial, the Commonwealth may attempt to take an immediate appeal of this order.

.

The Sixth Amendment issue has been finally decided by the highest court of Pennsylvania, and unless we review that decision, the harm that the Commonwealth seeks to avoid—the disclosure of the entire confidential file—will occur regardless of the result on remand. We thus cannot agree with the suggestion in JUSTICE STEVENS' dissent that if we were to dismiss this case and it was resolved on other grounds after disclosure of the file, "the Commonwealth would not have been harmed." *Post*, at 74. This hardly could be true, because of the acknowledged public interest in ensuring the confidentiality of CYS records. See n. 17, *infra*. Although this consideration is not dispositive, we have noted that "statutorily created finality requirements

See Pa. Rule App. Proc. 311(a). JUSTICE STEVENS' dissent suggests that because the Commonwealth can raise the Sixth Amendment issue again in this appeal, respect for the finality doctrine should lead us to dismiss. But even if we were persuaded that an immediate appeal would lie in this situation, it would not necessarily follow that the constitutional issue will survive. The appellate court could find that the failure to disclose was harmless, precluding further review by the Commonwealth. Alternatively, the appellate court could agree that the error was prejudicial, thus permitting the Commonwealth to claim that the Sixth Amendment does not compel disclosure. But as JUSTICE STEVENS' dissent recognizes, the Pennsylvania courts already have considered and resolved this issue in their earlier proceedings; if the Commonwealth were to raise it again in a new set of appeals, the courts below would simply reject the claim under the law-of-the-case doctrine. Law-of-the-case principles are not a bar to this Court's jurisdiction, of course, and thus JUSTICE STEVENS' dissent apparently would require the Commonwealth to raise a fruitless Sixth Amendment claim in the trial court, the Superior Court, and the Pennsylvania Supreme Court still another time before we regrant certiorari on the question that is now before us.

The goals of finality would be frustrated, rather than furthered, by these wasteful and time-consuming procedures. Based on the unusual facts of this case, the justifications for the finality doctrine—efficiency, judicial restraint, and federalism, see *Radio Station WOW, Inc.* v. *Johnson*, 326 U. S. 120, 124 (1945); *post*, at 72—would be ill served by another round of litigation on an issue that has been authoritatively decided by the highest state court.

should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered." *Mathews* v. *Eldridge*, 424 U. S. 319, 331, n. 11 (1976). We therefore reject Ritchie's claim that the Court lacks jurisdiction, and turn to the merits of the case before us.[8]

---

[8] Nothing in our decision in *United States* v. *Ryan*, 402 U. S. 530 (1971), requires a different result. In that case the respondent was served with a subpoena requiring him to produce business records for a grand jury. The District Court denied a motion to quash, and respondent appealed. We concluded that the District Court order was not appealable. *Id.*, at 532. We rejected the contention that immediate review was necessary to avoid the harm of disclosing otherwise protected material, noting that parties who face such an order have the option of making the decision "final" simply by refusing to comply with the subpoena.

Although there are similarities between this case and *Ryan*, the analogy is incomplete. In *Ryan* the Court was concerned about the "necessity for expedition in the administration of the criminal law," *id.*, at 533, an interest that would be undermined if all pretrial orders were immediately appealable. *Ryan* also rests on an implicit assumption that unless a party resisting discovery is willing to risk being held in contempt, the significance of his claim is insufficient to justify interrupting the ongoing proceedings. That is not the situation before us. Here the trial *already* has taken place, and the issue reviewed by the Commonwealth appellate courts. The interests of judicial economy and the avoidance of delay, rather than being hindered, would be best served by resolving the issue. Cf. *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S., 469, 477–478 (1975) (exceptions to finality doctrine justified in part by need to avoid economic waste and judicial delay).

We also reject Ritchie's suggestion that we should dismiss this action and allow the case to return to the trial court, so that the Commonwealth can formally refuse to comply with the Pennsylvania Supreme Court decision and be held in contempt. Here we are not faced merely with an individual's assertion that a subpoena is unduly burdensome, but with a holding of a State Supreme Court that the legislative interest in confidentiality will not be given effect. The Commonwealth's interest in immediate review of this case is obvious and substantial. Contrary to JUSTICE STEVENS' dissent, we do not think that the finality doctrine requires a new round of litigation and appellate review simply to give the Commonwealth "the chance to decide whether to comply with the order." *Post*, at 77. See n. 7, *supra*. To prolong the proceedings on this basis would be incon-

## III

The Pennsylvania Supreme Court held that Ritchie, through his lawyer, has the right to examine the full contents of the CYS records. The court found that this right of access is required by both the Confrontation Clause and the Compulsory Process Clause. We discuss these constitutional provisions in turn.

### A

The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination. *Delaware* v. *Fensterer*, 474 U. S. 15, 18–19 (1985) *(per curiam)*. Ritchie does not allege a violation of the former right. He was not excluded from any part of the trial, nor did the prosecutor improperly introduce out-of-court statements as substantive evidence, thereby depriving Ritchie of the right to "confront" the declarant. See *Ohio* v. *Roberts*, 448 U. S. 56 (1980). Cf. *United States* v. *Inadi*, 475 U. S. 387 (1986). Instead, Ritchie claims that by denying him access to the information necessary to prepare his defense, the trial court interfered with his right of cross-examination.

Ritchie argues that he could not effectively question his daughter because, without the CYS material, he did not know which types of questions would best expose the weaknesses in her testimony. Had the files been disclosed, Ritchie argues that he might have been able to show that the daughter made statements to the CYS counselor that were inconsistent with her trial statements, or perhaps to reveal that the girl acted with an improper motive. Of course, the right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or

---

sistent with the "pragmatic" approach we normally have taken to finality questions. See generally *Bradley* v. *Richmond School Bd.*, 416 U. S. 696, 722–723, n. 28 (1974) ("This Court has been inclined to follow a 'pragmatic approach' to the question of finality") (citation omitted).

unbelievable. *United States* v. *Abel,* 469 U. S. 45, 50 (1984); *Davis* v. *Alaska,* 415 U. S. 308, 316 (1974). Because this type of evidence can make the difference between conviction and acquittal, see *Napue* v. *Illinois,* 360 U. S. 264, 269 (1959), Ritchie argues that the failure to disclose information that might have made cross-examination more effective undermines the Confrontation Clause's purpose of increasing the accuracy of the truth-finding process at trial. See *United States* v. *Inadi, supra,* at 396.

The Pennsylvania Supreme Court accepted this argument, relying in part on our decision in *Davis* v. *Alaska, supra.* In *Davis* the trial judge prohibited defense counsel from questioning a witness about the latter's juvenile criminal record, because a state statute made this information presumptively confidential. We found that this restriction on cross-examination violated the Confrontation Clause, despite Alaska's legitimate interest in protecting the identity of juvenile offenders. 415 U. S., at 318–320. The Pennsylvania Supreme Court apparently interpreted our decision in *Davis* to mean that a statutory privilege cannot be maintained when a defendant asserts a need, prior to trial, for the protected information that might be used at trial to impeach or otherwise undermine a witness' testimony. See 509 Pa., at 365–367, 502 A. 2d, at 152–153.

If we were to accept this broad interpretation of *Davis,* the effect would be to transform the Confrontation Clause into a constitutionally compelled rule of pretrial discovery. Nothing in the case law supports such a view. The opinions of this Court show that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. See *California* v. *Green,* 399 U. S. 149, 157 (1970) ("[I]t is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause"); *Barber* v. *Page,* 390 U. S. 719, 725 (1968) ("The right to confrontation is basically a trial

right"). The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony.[9] Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses. *Delaware* v. *Fensterer*, 474 U. S., at 20. In short, the Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.*, at 20 (emphasis in original). See also *Ohio* v. *Roberts, supra*, at 73, n. 12 (except in "extraordinary cases, no inquiry into 'effectiveness' [of cross-examination] is required").

We reaffirmed this interpretation of the Confrontation Clause last Term in *Delaware* v. *Fensterer, supra*. In that case, the defendant was convicted in part on the testimony of the State's expert witness, who could not remember which scientific test he had used to form his opinion. Although this inability to recall frustrated defense counsel's efforts to discredit the testimony, we held that there had been no Sixth Amendment violation. The Court found that the right of confrontation was not implicated, "for the trial court did not limit the scope or nature of defense counsel's cross-examination in any way." 474 U. S., at 19. *Fensterer* was in full accord with our earlier decisions that have upheld a Confrontation Clause infringement claim on this issue only

---

[9] This is not to suggest, of course, that there are no protections for pretrial discovery in criminal cases. See discussion in Part III–B, *infra*. We simply hold that with respect to this issue, the Confrontation Clause only protects a defendant's trial rights, and does not compel the pretrial production of information that might be useful in preparing for trial. Also, we hardly need say that nothing in our opinion today is intended to alter a trial judge's traditional power to control the scope of cross-examination by prohibiting questions that are prejudicial, irrelevant, or otherwise improper. See *Delaware* v. *Van Arsdall*, 475 U. S. 673, 678 (1986).

when there was a specific statutory or court-imposed restriction at trial on the scope of questioning.[10]

The lower court's reliance on *Davis* v. *Alaska* therefore is misplaced. There the state court had prohibited defense counsel from questioning the witness about his criminal record, even though that evidence might have affected the witness' credibility. The constitutional error in that case was *not* that Alaska made this information confidential; it was that the defendant was denied the right "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." 415 U. S., at 318. Similarly, in this case the Confrontation Clause was not violated by the withholding of the CYS file; it only would have been impermissible for the judge to have prevented Ritchie's lawyer from cross-examining the daughter. Because defense counsel was able to cross-examine all of the trial witnesses fully, we find that the Pennsylvania Supreme Court erred in holding that the failure to disclose the CYS file violated the Confrontation Clause.

---

[10] See, *e. g.*, *Delaware* v. *Van Arsdall, supra* (denial of right to cross-examine to show bias); *Davis* v. *Alaska*, 415 U. S. 308 (1974); *Chambers* v. *Mississippi*, 410 U. S. 284 (1973) (denial of right to impeach own witness); *Smith* v. *Illinois*, 390 U. S. 129 (1968) (denial of right to ask witness' real name and address at trial); *Douglas* v. *Alabama*, 380 U. S. 415 (1965) (denial of right to cross-examine codefendant). Moreover, the Court normally has refused to find a Sixth Amendment violation when the asserted interference with cross-examination did not occur at trial. Compare *McCray* v. *Illinois*, 386 U. S. 300, 311–313 (1967) (no Confrontation Clause violation where defendant was denied the chance to discover an informant's name at pretrial hearing), with *Roviaro* v. *United States*, 353 U. S. 53 (1957) (on the facts presented, Government required to disclose informant's name at trial). See generally Westen, The Compulsory Process Clause, 73 Mich. L. Rev. 71, 125–126 (1974) ("The right of confrontation is exclusively a 'trial right' . . . . It does not . . . require the government to produce witnesses whose statements are not used at trial, or to produce the underlying information on which its witnesses base their testimony") (footnotes omitted) (hereinafter Westen).

## B

The Pennsylvania Supreme Court also suggested that the failure to disclose the CYS file violated the Sixth Amendment's guarantee of compulsory process. Ritchie asserts that the trial court's ruling prevented him from learning the names of the "witnesses in his favor," as well as other evidence that might be contained in the file. Although the basis for the Pennsylvania Supreme Court's ruling on this point is unclear, it apparently concluded that the right of compulsory process includes the right to have the State's assistance in uncovering arguably useful information, without regard to the existence of a state-created restriction—here, the confidentiality of the files.

### 1

This Court has had little occasion to discuss the contours of the Compulsory Process Clause. The first and most celebrated analysis came from a Virginia federal court in 1807, during the treason and misdemeanor trials of Aaron Burr. Chief Justice Marshall, who presided as trial judge, ruled that Burr's compulsory process rights entitled him to serve a subpoena on President Jefferson, requesting the production of allegedly incriminating evidence.[11] *United States* v. *Burr*, 25 F. Cas. 30, 35 (No. 14,692d) (CC Va. 1807). Despite the implications of the *Burr* decision for federal criminal procedure, the Compulsory Process Clause rarely was a factor in this Court's decisions during the next 160 years.[12] More re-

---

[11] The evidence consisted of a letter that was sent to President Jefferson by General James Wilkinson that allegedly showed that Burr was planning to invade Mexico and set up a separate government under his control. After being ordered to do so, Jefferson eventually turned over an edited version of the letter. For an excellent summary of the *Burr* case and its implications for compulsory process, see Westen 101–108.

[12] The pre-1967 cases that mention compulsory process do not provide an extensive analysis of the Clause. See *Pate* v. *Robinson*, 383 U. S. 375, 378, n. 1 (1966); *Blackmer* v. *United States*, 284 U. S. 421, 442 (1932); *United States* v. *Van Duzee*, 140 U. S. 169, 173 (1891); *Ex parte Harding*, 120 U. S. 782 (1887). See generally Westen 108, and n. 164.

cently, however, the Court has articulated some of the specific rights secured by this part of the Sixth Amendment. Our cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.[18]

This Court has never squarely held that the Compulsory Process Clause guarantees the right to discover the *identity* of witnesses, or to require the government to produce exculpatory evidence. But cf. *United States* v. *Nixon*, 418 U. S. 683, 709, 711 (1974) (suggesting that the Clause may require the production of evidence). Instead, the Court traditionally has evaluated claims such as those raised by Ritchie under the broader protections of the Due Process Clause of the Fourteenth Amendment. See *United States* v. *Bagley*, 473 U. S. 667 (1985); *Brady* v. *Maryland*, 373 U. S. 83 (1963). See also *Wardius* v. *Oregon*, 412 U. S. 470 (1973). Because the applicability of the Sixth Amendment to this type of case is unsettled, and because our Fourteenth Amendment precedents addressing the fundamental fairness of trials establish a clear framework for review, we adopt a due process analysis for purposes of this case. Although we conclude that compulsory process provides no *greater* protections in this area than those afforded by due process, we need not decide today whether and how the guarantees of the Compulsory Process Clause differ from those of the Fourteenth Amendment. It is enough to conclude that on these facts, Ritchie's claims more properly are considered by reference to due process.

---

[18] See, *e. g.*, *Chambers* v. *Mississippi, supra; Cool* v. *United States*, 409 U. S. 100 (1972) *(per curiam); Washington* v. *Texas*, 388 U. S. 14 (1967). Cf. *Webb* v. *Texas*, 409 U. S. 95 (1972) *(per curiam)* (decision based on Due Process Clause).

## 2

It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. *United States* v. *Agurs,* 427 U. S. 97 (1976); *Brady* v. *Maryland, supra,* at 87. Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley,* 473 U. S., at 682 (opinion of BLACKMUN, J.); see *id.,* at 685 (opinion of WHITE, J.).

At this stage, of course, it is impossible to say whether any information in the CYS records may be relevant to Ritchie's claim of innocence, because neither the prosecution nor defense counsel has seen the information, and the trial judge acknowledged that he had not reviewed the full file. The Commonwealth, however, argues that no materiality inquiry is required, because a statute renders the contents of the file privileged. Requiring disclosure here, it is argued, would override the Commonwealth's compelling interest in confidentiality on the mere speculation that the file "might" have been useful to the defense.

Although we recognize that the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances. This is not a case where a state statute grants CYS the absolute authority to shield its files from all eyes. Cf. 42 Pa. Cons. Stat. § 5945.1(b) (1982) (unqualified statutory privilege for communications between sexual assault counselors and victims).[14] Rather, the Pennsylvania

[14] We express no opinion on whether the result in this case would have been different if the statute had protected the CYS files from disclosure to *anyone,* including law-enforcement and judicial personnel.

law provides that the information shall be disclosed in certain circumstances, including when CYS is directed to do so by court order. Pa. Stat. Ann., Title 11, § 2215(a)(5) (Purdon Supp. 1986). Given that the Pennsylvania Legislature contemplated *some* use of CYS records in judicial proceedings, we cannot conclude that the statute prevents all disclosure in criminal prosecutions. In the absence of any apparent state policy to the contrary, we therefore have no reason to believe that relevant information would not be disclosed when a court of competent jurisdiction determines that the information is "material" to the defense of the accused.

We therefore affirm the decision of the Pennsylvania Supreme Court to the extent it orders a remand for further proceedings. Ritchie is entitled to have the CYS file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial. If it does, he must be given a new trial. If the records maintained by CYS contain no such information, or if the nondisclosure was harmless beyond a reasonable doubt, the lower court will be free to reinstate the prior conviction.[15]

---

[15] The Commonwealth also argues that Ritchie is not entitled to disclosure because he did not make a particularized showing of what information he was seeking or how it would be material. See Brief for Petitioner 18 (quoting *United States* v. *Agurs*, 427 U. S. 97, 109–110 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense")). Ritchie, of course, may not require the trial court to search through the CYS file without first establishing a basis for his claim that it contains material evidence. See *United States* v. *Valenzuela-Bernal*, 458 U. S. 858, 867 (1982) ("He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense"). Although the obligation to disclose exculpatory material does not depend on the presence of a specific request, we note that the degree of specificity of Ritchie's request may have a bearing on the trial court's assessment on remand of the materiality of the nondisclosure. See *United States* v. *Bagley*, 473 U. S. 667, 682–683 (1985) (opinion of BLACKMUN, J.).

## C

This ruling does not end our analysis, because the Pennsylvania Supreme Court did more than simply remand. It also held that defense counsel must be allowed to examine all of the confidential information, both relevant and irrelevant, and present arguments in favor of disclosure. The court apparently concluded that whenever a defendant alleges that protected evidence might be material, the appropriate method of assessing this claim is to grant full access to the disputed information, regardless of the State's interest in confidentiality. We cannot agree.

A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files. See *United States* v. *Bagley, supra,* at 675; *United States* v. *Agurs, supra,* at 111. Although the eye of an advocate may be helpful to a defendant in ferreting out information, *Dennis* v. *United States,* 384 U. S. 855, 875 (1966), this Court has never held—even in the absence of a statute restricting disclosure—that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under *Brady* v. *Maryland,* 373 U. S. 83 (1963), it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention,[16] the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance. See *Weatherford* v. *Bursey,* 429 U. S. 545, 559 (1977) ("There

---

[16] See Fed. Rule Crim. Proc. 16(d)(2); Pa. Rule Crim. Proc. 305(E) ("If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule [mandating disclosure of exculpatory evidence], the court may . . . enter such . . . order as it deems just under the circumstances").

is no general constitutional right to discovery in a criminal case, and *Brady* did not create one").

We find that Ritchie's interest (as well as that of the Commonwealth) in ensuring a fair trial can be protected fully by requiring that the CYS files be submitted only to the trial court for *in camera* review. Although this rule denies Ritchie the benefits of an "advocate's eye," we note that the trial court's discretion is not unbounded. If a defendant is aware of specific information contained in the file (*e. g.,* the medical report), he is free to request it directly from the court, and argue in favor of its materiality. Moreover, the duty to disclose is ongoing; information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the trial.

To allow full disclosure to defense counsel in this type of case would sacrifice unnecessarily the Commonwealth's compelling interest in protecting its child-abuse information. If the CYS records were made available to defendants, even through counsel, it could have a seriously adverse effect on Pennsylvania's efforts to uncover and treat abuse. Child abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim. A child's feelings of vulnerability and guilt and his or her unwillingness to come forward are particularly acute when the abuser is a parent. It therefore is essential that the child have a state-designated person to whom he may turn, and to do so with the assurance of confidentiality. Relatives and neighbors who suspect abuse also will be more willing to come forward if they know that their identities will be protected. Recognizing this, the Commonwealth—like all other States [17]—has made a commendable effort to assure vic-

---

[17] The importance of the public interest at issue in this case is evidenced by the fact that all 50 States and the District of Columbia have statutes that protect the confidentiality of their official records concerning child abuse. See Brief for State of California *ex rel.* John K. Van de Kamp et al.

tims and witnesses that they may speak to the CYS counselors without fear of general disclosure. The Commonwealth's purpose would be frustrated if this confidential material had to be disclosed upon demand to a defendant charged with criminal child abuse, simply because a trial court may not recognize exculpatory evidence. Neither precedent nor common sense requires such a result.

## IV

We agree that Ritchie is entitled to know whether the CYS file contains information that may have changed the outcome of his trial had it been disclosed. Thus we agree that a remand is necessary. We disagree with the decision of the Pennsylvania Supreme Court to the extent that it allows defense counsel access to the CYS file. An *in camera* review by the trial court will serve Ritchie's interest without destroying the Commonwealth's need to protect the confidentiality of those involved in child-abuse investigations. The judgment of the Pennsylvania Supreme Court is affirmed in part and reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join Parts I, II, III–B, III–C, and IV of the Court's opinion. I write separately, however, because I do not accept the plurality's conclusion, as expressed in Part III–A of JUSTICE POWELL's opinion, that the Confrontation Clause protects only a defendant's trial rights and has no relevance to pretrial discovery. In this, I am in substantial agreement with much of what JUSTICE BRENNAN says, *post*, in dissent. In my view, there might well be a confrontation violation

as *Amici Curiae* 12, n. 1 (listing illustrative statutes). See also Besharov, The Legal Aspects of Reporting Known and Suspected Child Abuse and Neglect, 23 Vill. L. Rev. 458, 508–512 (1978).

if, as here, a defendant is denied pretrial access to information that would make possible effective cross-examination of a crucial prosecution witness.

The plurality recognizes that the Confrontation Clause confers upon a defendant a right to conduct cross-examination. *Ante,* at 51. It believes that this right is satisfied so long as defense counsel can *question* a witness on any proper subject of cross-examination. For the plurality, the existence of a confrontation violation turns on whether counsel has the opportunity to conduct such questioning; the plurality in effect dismisses—or, at best, downplays—any inquiry into the effectiveness of the cross-examination. *Ante,* at 51–52. Thus, the plurality confidently can state that the Confrontation Clause creates nothing more than a trial right. *Ante,* at 52.

If I were to accept the plurality's effort to divorce confrontation analysis from any examination into the effectiveness of cross-examination, I believe that in some situations the confrontation right would become an empty formality. As even the plurality seems to recognize, see *ante,* at 51–52, one of the primary purposes of cross-examination is to call into question a witness' credibility. This purpose is often met when defense counsel can demonstrate that the witness is biased or cannot clearly remember the events crucial to the testimony. The opportunity the Confrontation Clause gives a defendant's attorney to pursue any proper avenue of questioning a witness makes little sense set apart from the goals of cross-examination.

There are cases, perhaps most of them, where simple questioning of a witness will satisfy the purposes of cross-examination. *Delaware* v. *Fensterer,* 474 U. S. 15 (1985) *(per curiam)* is one such example. There the Court rejected a Confrontation Clause challenge brought on the ground that an expert witness for the prosecution could not remember the method by which he had determined that some hair of the victim, whom Fensterer was accused of killing, had been

forcibly removed. Although I did not join the summary reversal in *Fensterer* and would have given the case plenary consideration, see *id.*, at 23, it is easy to see why cross-examination was effective there. The expert's credibility and conclusions were seriously undermined by a demonstration that he had forgotten the method he used in his analysis. Simple questioning provided such a demonstration, and was reinforced by the testimony of the defendant's own expert who could undermine the other expert's opinion. See *id.*, at 20.[1]

There are other cases where, in contrast, simple questioning will not be able to undermine a witness' credibility and in fact may do actual injury to a defendant's position. *Davis* v. *Alaska*, 415 U. S. 308 (1974), is a specific example. There defense counsel had the juvenile record of a key prosecution witness in hand but was unable to refer to it during his cross-examination of the witness because of an Alaska rule prohibiting the admission of such a record in a court proceeding. *Id.*, at 310–311. The juvenile record revealed that the witness was on probation for the same burglary for which Davis was charged. Accordingly, the possibility existed that the witness was biased or prejudiced against Davis, in that he was attempting to turn towards Davis the attention of the police that would otherwise have been directed against him.

---

[1] Accordingly, the remark from *Delaware* v. *Fensterer*, which the plurality would use, *ante*, at 53, as support for its argument that confrontation analysis has little to do with inquiries concerning the effectiveness of cross-examination, actually suggests the opposite. The Court observed in *Fensterer* that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." 474 U. S., at 20 (emphasis in original). This remark does not imply that concern about such effectiveness has no place in analysis under the Confrontation Clause. Rather, it means that when, as in *Fensterer*, simple questioning serves the purpose of cross-examination, a defendant cannot claim a confrontation violation because there might have been a more effective means of cross-examination.

Although Davis' counsel was permitted to "question" the witness as to bias, any attempt to point to the reason for that bias was denied. *Id.*, at 313–314.

In the Court's view, this questioning of the witness both was useless to Davis and actively harmed him. The Court observed: "On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a 'rehash' of prior cross-examination." *Id.*, at 318. The Court concluded that, without being able to refer to the witness' juvenile record, "[p]etitioner was thus denied the right of effective cross-examination." *Ibid.*

The similarities between *Davis* and this case are much greater than are any differences that may exist. In cross-examining a key prosecution witness, counsel for Davis and counsel for respondent were both limited to simple questioning. They could not refer to specific facts that might have established the critical bias of the witness: Davis' counsel could not do so because, while he had the juvenile record in hand, he could not refer to it in light of the Alaska rule, see *id.*, at 311, n. 1; respondent's attorney had a similar problem because he had no access at all to the CYS file of the child-abuse victim, see *ante*, at 43–44, and n. 2. Moreover, it is likely that the reaction of each jury to the actual cross-examination was the same—a sense that defense counsel was doing nothing more than harassing a blameless witness.

It is true that, in a technical sense, the situations of Davis and Ritchie are different. Davis' counsel had access to the juvenile record of the witness and could have used it but for the Alaska prohibition. Thus, the infringement upon Davis' confrontation right occurred at the trial stage when his counsel was unable to pursue an available line of inquiry. Respondent's attorney could not cross-examine his client's daughter with the help of the possible evidence in the CYS

file because of the Pennsylvania prohibition that affected his pretrial preparations. I do not believe, however, that a State can avoid Confrontation Clause problems simply by deciding to hinder the defendant's right to effective cross-examination, on the basis of a desire to protect the confidentiality interests of a particular class of individuals, at the pretrial, rather than at the trial, stage.

Despite my disagreement with the plurality's reading of the Confrontation Clause, I am able to concur in the Court's judgment because, in my view, the procedure the Court has set out for the lower court to follow on remand is adequate to address any confrontation problem. Here I part company with JUSTICE BRENNAN. Under the Court's prescribed procedure, the trial judge is directed to review the CYS file for "material" information. *Ante*, at 58. This information would certainly include such evidence as statements of the witness that might have been used to impeach her testimony by demonstrating any bias towards respondent or by revealing inconsistencies in her prior statements.[2] When reviewing confidential records in future cases, trial courts should be particularly aware of the possibility that impeachment evidence of a key prosecution witness could well constitute the sort whose unavailability to the defendant would undermine confidence in the outcome of the trial. As the Court points out, moreover, the trial court's obligation to review the confidential record for material information is ongoing.

---

[2] In *United States* v. *Bagley*, 473 U. S. 667 (1985), the Court rejected any distinction between exculpatory and impeachment evidence for purposes of *Brady* v. *Maryland*, 373 U. S. 83 (1963). 473 U. S., at 676. We noted that nondisclosure of impeachment evidence falls within the general rule of *Brady* "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence.'" *Id.*, at 677, quoting *Giglio* v. *United States*, 405 U. S. 150, 154 (1972). We observed moreover, that, while a restriction on pretrial discovery might not suggest as direct a violation on the confrontation right as would a restriction on the scope of cross-examination at trial, the former was not free from confrontation concerns. 473 U. S., at 678.

Impeachment evidence is precisely the type of information that might be deemed to be material only well into the trial, as, for example, after the key witness has testified.[3]

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

I join JUSTICE STEVENS' dissenting opinion regarding the lack of finality in this case. I write separately to challenge the Court's narrow reading of the Confrontation Clause as applicable only to events that occur at trial. That interpretation ignores the fact that the right of cross-examination also may be significantly infringed by events occurring outside the trial itself, such as the wholesale denial of access to material that would serve as the basis for a significant line of inquiry at trial. In this case, the trial court properly viewed Ritchie's vague speculations that the agency file might contain something useful as an insufficient basis for permitting general access to the file. However, in denying access to the prior statements of the victim the court deprived Ritchie of material crucial to any effort to impeach the victim at trial. I view this deprivation as a violation of the Confrontation Clause.

This Court has made it plain that "a primary interest secured by [the Confrontation Clause] is the right of cross-examination," *Douglas* v. *Alabama,* 380 U. S. 415, 418 (1965). "[P]robably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case," *Pointer* v. *Texas,* 380 U. S. 400, 404 (1965). The Court therefore has scrupulously guarded against "restrictions imposed by law or by the trial court on the scope of

---

[3] If the withholding of confidential material from the defendant at the pretrial stage is deemed a Confrontation Clause violation, harmless-error analysis, of course, may still be applied. See *Delaware* v. *Van Arsdall,* 475 U. S. 673, 684 (1986).

cross-examination." *Delaware* v. *Fensterer*, 474 U. S. 15, 18 (1985) *(per curiam)*.

One way in which cross-examination may be restricted is through preclusion at trial itself of a line of inquiry that counsel seeks to pursue. See *ante*, at 53, n. 9 (citing cases). The logic of our concern for restriction on the ability to engage in cross-examination does not suggest, however, that the Confrontation Clause prohibits *only* such limitations.* A crucial avenue of cross-examination also may be foreclosed by the denial of access to material that would serve as the basis for this examination. Where denial of access is complete, counsel is in no position to formulate a line of inquiry potentially grounded on the material sought. Thus, he or she cannot point to a specific subject of inquiry that has been foreclosed, as can a counsel whose interrogation at trial has been limited by the trial judge. Nonetheless, there occurs as effective a preclusion of a topic of cross-examination as if the judge at trial had ruled an entire area of questioning off limits.

---

*The Court contends that its restrictive view is supported by statements in *California* v. *Green*, 399 U. S. 149, 157 (1970), and *Barber* v. *Page*, 390 U. S. 719, 725 (1968), that the right to confrontation is essentially a trial right. Neither statement, however, was intended to address the question whether Confrontation Clause rights may be implicated by events outside of trial. In *Green*, the Court held that it was permissible to introduce at trial the out-of-court statements of a witness available for cross-examination. The Court rejected the argument that the Confrontation Clause precluded the admission of all hearsay evidence, because the ability of the defendant to confront and cross-examine the witness at trial satisfied the concerns of that Clause. 399 U. S., at 157. In *Barber*, the Court held that, where a witness could be called to testify, the failure to do so was not excused by the fact that defense counsel had an opportunity to cross-examine the witness at a preliminary hearing. The Court held that, since the Confrontation Clause is concerned with providing an opportunity for cross-examination at trial, the failure to afford such an opportunity when it was clearly available violated that Clause. Thus, neither *Green* nor *Barber* suggested that the right of confrontation attached exclusively at trial.

The Court has held that the right of cross-examination may be infringed even absent limitations on questioning imposed at trial. *Jencks* v. *United States*, 353 U. S. 657 (1957), held that the defendant was entitled to obtain the prior statements of persons to government agents when those persons testified against him at trial. Impeachment of the witnesses was "singularly important" to the defendant, we said, *id.*, at 667, and the reports were essential to the impeachment effort. Thus, we held that a defendant is entitled to inspect material "with a view to use on cross-examination" when that material "[is] shown to relate to the testimony of the witness." *Id.*, at 669. As I later noted in *Palermo* v. *United States*, 360 U. S. 343 (1959), *Jencks* was based on our supervisory authority rather than the Constitution, "but it would be idle to say that the commands of the Constitution were not close to the surface of the decision." 360 U. S., at 362–363 (BRENNAN, J., concurring in result). In *Palermo*, I specifically discussed the Confrontation Clause as a likely source of the rights implicated in a case such as *Jencks*. 360 U. S., at 362.

The Court insists that the prerequisite for finding a restriction on cross-examination is that counsel be prevented from pursuing a specific line of questioning. This position has similarities to an argument the Court rejected in *Jencks*. The Government contended in that case that the prerequisite for obtaining access to witnesses' prior statements should be a showing by the defendant of an inconsistency between those statements and trial testimony. We rejected that argument, noting, "[t]he occasion for determining a conflict cannot arise until after the witness has testified, and unless he admits conflict, . . . the accused is helpless to know or discover conflict without inspecting the reports." 353 U. S., at 667–668. Cf. *United States* v. *Burr*, 25 F. Cas. 187, 191 (No. 14,694) (CC Va. 1807) ("It is objected that the particular passages of the letter which are required are not pointed out. But how can this be done while the letter itself is witheld?"). Simi-

larly, unless counsel has access to prior statements of a witness, he or she cannot identify what subjects of inquiry have been foreclosed from exploration at trial. Under the Court's holding today, the result is that partial denials of access may give rise to Confrontation Clause violations, but absolute denials cannot.

The Court in *United States* v. *Wade*, 388 U. S. 218 (1967), also recognized that pretrial events may undercut the right of cross-examination. In *Wade*, we held that a pretrial identification lineup was a critical stage of criminal proceedings at which the Sixth Amendment right to counsel was applicable. This holding was premised explicitly on concern for infringement of Confrontation Clause rights. The presence of counsel at a lineup is necessary, the Court said, "to preserve the defendant's right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." *Id.*, at 227. If counsel is excluded from such a proceeding, he or she is at a serious disadvantage in calling into question an identification at trial. The "inability effectively to reconstruct at trial any unfairness that occurred at the lineup" may then "deprive [the defendant] of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification." *Id.*, at 232. The Court continued:

> "Insofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, *the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him. Pointer* v. *Texas*, 380 U. S. 400." *Id.*, at 235 (emphasis added).

Since a lineup from which counsel is absent is potentially prejudicial, and "since presence of counsel itself can often avert prejudice *and assure a meaningful confrontation at trial*", *id.*, at 236 (emphasis added) (footnote omitted), the

Court in *Wade* concluded that a pretrial lineup is a stage of prosecution at which a defendant is entitled to have counsel present.

The exclusion of counsel from the lineup session necessarily prevents him or her from posing any specific cross-examination questions based on observation of how the lineup was conducted. The Court today indicates that this inability would preclude a finding that cross-examination has been restricted. The premise of the Court in *Wade*, however, was precisely the opposite: the very problem that concerned the Court was that counsel would be foreclosed from developing a line of inquiry grounded on actual experience with the lineup.

The Court suggests that the court below erred in relying on *Davis* v. *Alaska*, 415 U. S. 308 (1974), for its conclusion that the denial of access to the agency file raised a Confrontation Clause issue. While *Davis* focused most explicitly on the restriction at trial of cross-examination, nothing in the opinion indicated that an infringement on the right to cross-examination could occur *only* in that context. Defense counsel was prevented from revealing to the jury that the government's witness was on probation. The immediate barrier to revelation was the trial judge's preclusion of counsel's effort to inquire into the subject on cross-examination. Yet the reason that counsel could not make such inquiry was a state statute that made evidence of juvenile adjudications inadmissible in court. Any counsel familiar with the statute would have no doubt that it foreclosed any line of questioning pertaining to a witness' juvenile record, despite the obvious relevance of such information for impeachment purposes. The foreclosure would have been just as effective had defense counsel never sought to pursue on cross-examination the issue of the witness' probationary status. The lower court thus properly recognized that the underlying problem for defense counsel in *Davis* was the prohibition on disclosure of juvenile records.

The creation of a significant impediment to the conduct of cross-examination thus undercuts the protections of the Confrontation Clause, even if that impediment is not erected at the trial itself. In this case, the foreclosure of access to prior statements of the testifying victim deprived the defendant of material crucial to the conduct of cross-examination. As we noted in *Jencks*, a witness' prior statements are essential to any effort at impeachment:

> "Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony." 353 U. S., at 667.

The right of a defendant to confront an accuser is intended fundamentally to provide an opportunity to subject *accusations* to critical scrutiny. See *Ohio* v. *Roberts*, 448 U. S. 56, 65 (1980) ("underlying purpose" of Confrontation Clause is "to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence"). Essential to testing a witness' account of events is the ability to compare that version with other versions the witness has earlier recounted. Denial of access to a witness' prior statements thus imposes a handicap that strikes at the heart of cross-examination.

The ability to obtain material information through reliance on a due process claim will not in all cases nullify the damage of the Court's overly restrictive reading of the Confrontation Clause. As the Court notes, *ante*, at 57, evidence is regarded as material only if there is a reasonable probability that it might affect the outcome of the proceeding. Prior

statements on their face may not appear to have such force, since their utility may lie in their more subtle potential for diminishing the credibility of a witness. The prospect that these statements will not be regarded as material is enhanced by the fact that due process analysis requires that information be evaluated by the trial judge, not defense counsel. *Ante*, at 59–60. By contrast, *Jencks*, informed by confrontation and cross-examination concerns, insisted that defense counsel, not the court, perform such an evaluation, "[b]ecause only the defense is adequately equipped to determine the effective use for the purpose of discrediting the Government's witness and thereby furthering the accused's defense." *Jencks, supra*, at 668–669. Therefore, while Confrontation Clause and due process analysis may in some cases be congruent, the Confrontation Clause has independent significance in protecting against infringements on the right to cross-examination.

The Court today adopts an interpretation of the Confrontation Clause unwarranted by previous case law and inconsistent with the underlying values of that constitutional provision. I therefore dissent.

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE SCALIA join, dissenting.

We are a Court of limited jurisdiction. One of the basic limits that Congress has imposed upon us is that we may only review "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had." 28 U. S. C. § 1257. The purposes of this restriction are obvious, and include notions of efficiency, judicial restraint, and federalism. See *Construction Laborers* v. *Curry*, 371 U. S. 542, 550 (1963); *Radio Station WOW, Inc.* v. *Johnson*, 326 U. S. 120, 124 (1945). Over the years the Court has consistently applied a strict test of finality to determine the reviewability of state-court decisions remanding cases for further proceedings, and the reviewability of pretrial discovery orders. Given the plethora of such decisions and orders and

the fact that they often lead to the settlement or termination of litigation, the application of these strict rules has unquestionably resulted in this Court's not reviewing countless cases that otherwise might have been reviewed. Despite that consequence—indeed, in my judgment, because of that consequence—I regard the rule as wise and worthy of preservation.

## I

In *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975), the Court recognized some limited exceptions to the general principle that this Court may not review cases in which further proceedings are anticipated in the state courts. One of these exceptions applies "where the federal claim has been finally decided, with further proceedings in the state courts to come, but in which later review of the federal issue cannot be had, whatever the ultimate outcome of the case." *Id.*, at 481. The concern, of course, is that the petitioning party not be put in a position where he might eventually lose on the merits, but would have never had an opportunity to present his federal claims for review. *Ibid.* The most common example of this phenomenon is where a State seeks review of an appellate court's order that evidence be suppressed. In such a case, if the State were forced to proceed to trial prior to seeking review in this Court, it could conceivably lose its case at trial, and, because of the double jeopardy rule, never have a chance to use what we might have held to be admissible evidence. See, *e. g.*, *New York* v. *Quarles*, 467 U. S. 649, 651, n. 1 (1984).

This case does not fit into that exception. Were we to decline review at this time there are three possible scenarios on remand. First, the Children and Youth Services (CYS) might refuse to produce the documents under penalty of contempt, in which case appeals could be taken, and this Court could obtain proper jurisdiction. See *United States* v. *Ryan*, 402 U. S. 530 (1971). Alternatively, if CYS were to produce the documents, the trial court might find the error to be

harmless, in which case Ritchie's conviction would stand and the Commonwealth would not have been harmed by our having declined to review the case at this stage. Finally, the trial court could determine that Ritchie's lack of access to the documents was constitutionally prejudicial, and thus order a new trial. If the Commonwealth would then have no recourse but to proceed to trial with the risk of an unreviewable acquittal, I agree that the *Cox* exception would apply. Under Pennsylvania law, however, the Commonwealth would have the opportunity for an immediate interlocutory appeal of the new trial order.

Pennsylvania Rule of Appellate Procedure 311(a)(5) affords the Commonwealth a right to an interlocutory appeal in criminal cases where it "claims that the lower court committed an error of law." An argument that the trial court erred in evaluating the constitutionally harmless-error issue would certainly qualify under that provision.[1] Moreover, the Commonwealth could, if necessary, reassert the constitutional arguments that it now makes here. Although the claims would undoubtedly be rejected in Pennsylvania under the law-of-the-case doctrine, that would not bar this Court from reviewing the claims. See *Barclay* v. *Florida,* 463 U. S. 939, 946 (1983); *Hathorn* v. *Lovorn,* 457 U. S. 255, 261–262 (1982); see

---

[1] See *Commonwealth* v. *Blevins,* 453 Pa. 481, 482–483, 309 A. 2d 421, 422 (1973) (whether "the testimony offered at trial by the Commonwealth was insufficient to support the jury's finding" is appealable issue of law); *Commonwealth* v. *Melton,* 402 Pa. 628, 629, 168 A. 2d 328, 329 (1961) (citing case "where a new trial is granted to a convicted defendant on the sole ground that the introduction of certain evidence at his trial was prejudicial error" as example of appealable issue of law); *Commonwealth* v. *Durah-El,* 344 Pa. Super. 511, 514, n. 2, 496 A. 2d 1222, 1224, n. 2 (1985) (whether trial counsel provided ineffective assistance of counsel is appealable as asserted "error of law"); *Commonwealth* v. *Carney,* 310 Pa. Super. 549, 551, n. 1, 456 A. 2d 1072, 1073, n. 1 (1983) (whether curative instruction was sufficient to remedy improper remark of prosecution witness is appealable as asserted "error of law").

generally R. Stern, E. Gressman, & S. Shapiro, Supreme Court Practice 132 (6th ed. 1986).

The fact that the Commonwealth of Pennsylvania cannot irrevocably lose this case on the federal constitutional issue without having an opportunity to present that issue to this Court takes this case out of the *Cox* exception that the Court relies upon. Nonetheless, the Court makes the astonishing argument that we should hear this case now because if Ritchie's conviction is reinstated on remand, "the issue of whether defense counsel should have been given access will be moot," and the Court will lose its chance to pass on this constitutional issue. *Ante*, at 48. This argument is wholly contrary to our long tradition of avoiding, not reaching out to decide, constitutional decisions when a case may be disposed of on other grounds for legitimate reasons. See *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring); *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 571 (1947). Indeed, the Court has explained that it is precisely the policy against unnecessary constitutional adjudication that demands strict application of the finality requirement. *Republic Natural Gas Co.* v. *Oklahoma*, 334 U. S. 62, 70–71 (1948).

II

The Court also suggests that a reason for hearing the case now is that, if CYS is forced to disclose the documents, the confidentiality will be breached and subsequent review will be too late. *Ante*, at 48–49, and n. 7. This argument fails in light of the longstanding rule that if disclosure will, in and of itself, be harmful, the remedy is for the individual to decline to produce the documents, and immediately appeal any contempt order that is issued. This rule is exemplified by our decision in *United States* v. *Ryan*, 402 U. S. 530 (1971), a case in which a District Court denied a motion to quash a subpoena *duces tecum* commanding the respondent to produce certain documents located in Kenya. The Court of Appeals held that the order was appealable but we reversed, explaining:

"Respondent asserts no challenge to the continued validity of our holding in *Cobbledick* v. *United States*, 309 U. S. 323 (1940), that one to whom a subpoena is directed may not appeal the denial of a motion to quash that subpoena but must either obey its commands or refuse to do so and contest the validity of the subpoena if he is subsequently cited for contempt on account of his failure to obey. Respondent, however, argues that *Cobbledick* does not apply in the circumstances before us because, he asserts, unless immediate review of the District Court's order is available to him, he will be forced to undertake a substantial burden in complying with the subpoena, and will therefore be 'powerless to avert the mischief of the order.' *Perlman* v. *United States*, 247 U. S. 7, 13 (1918).

"We think that respondent's assertion misapprehends the thrust of our cases. Of course, if he complies with the subpoena he will not thereafter be able to undo the substantial effort he has exerted in order to comply. But compliance is not the only course open to respondent. If, as he claims, the subpoena is unduly burdensome or otherwise unlawful, he may refuse to comply and litigate those questions in the event that contempt or similar proceedings are brought against him. Should his contentions be rejected at that time by the trial court, they will then be ripe for appellate review. But we have consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal. *Cobbledick* v. *United States, supra; Alexander* v. *United States*, 201 U. S. 117 (1906); cf. *United States* v. *Blue*, 384 U. S. 251 (1966); *DiBella*

v. *United States*, 369 U. S. 121 (1962); *Carroll* v. *United States*, 354 U. S. 394 (1957). Only in the limited class of cases where denial of immediate review would render impossible any review whatsoever of an individual's claims have we allowed exceptions to this principle." *Id.*, at 532–533.

In the case before us today, the Pennsylvania Supreme Court has instructed the trial court to order CYS to produce certain documents for inspection by the trial court and respondent's counsel. Although compliance with the order might be burdensome for a different reason than the burden of obtaining documents in Kenya, the burden of disclosure is sufficiently troublesome to CYS that it apparently objects to compliance.[2] But as was true in the *Ryan* case, it has not yet been given the chance to decide whether to comply with the order and therefore has not satisfied the condition for appellate review that we had, until today, consistently imposed.[3]

---

[2] It is not clear to what extent counsel for the Commonwealth in this case represents CYS, or whether he only represents the Office of the District Attorney of Allegheny County. CYS is certainly not a party to this case; in fact it has filed an *amicus curiae* brief expressing its views. That CYS is not a party to the case makes it all the more inappropriate for the Court to relax the rule of finality in order to spare CYS the need to appeal a contempt order if it fails to produce the documents.

[3] The Court has recognized a limited exception to this principle where the documents at issue are in the hands of a third party who has no independent interest in preserving their confidentiality. See *Perlman* v. *United States*, 247 U. S. 7 (1918); see also *United States* v. *Ryan*, 402 U. S. 530, 533 (1971). This case presents a far different situation. As far as the disclosure of the documents goes, it is CYS, not the prosecutor, that claims a duty to preserve their confidentiality and to implement Pennsylvania's Child Protective Services Law. See Brief for Allegheny County, Pennsylvania, on behalf of Allegheny County Children and Youth Services as *Amicus Curiae* in Support of Petitioner 2.

Nor does this case come within the exception of *United States* v. *Nixon*, 418 U. S. 683, 691–692 (1974), where the Court did not require the President of the United States to subject himself to contempt in order to appeal

## III

Finally, the Court seems to rest on the rationale that because this respondent has already been tried, immediate review in this particular case will expedite the termination of the litigation. See *ante*, at 48–49, n. 7. I am not persuaded that this is so—if we had not granted certiorari, the trial court might have reviewed the documents and found that they are harmless a year ago—but even if it were, the efficient enforcement of the finality rule precludes a case-by-case inquiry to determine whether its application is appropriate. Only by adhering to our firm rules of finality can we discourage time-consuming piecemeal litigation.

Of course, once the case is here and has been heard, there is natural reluctance to hold that the Court lacks jurisdiction. It is misguided, however, to strain and find jurisdiction in the name of short-term efficiency when the long-term effect of the relaxation of the finality requirement will so clearly be inefficient. If the Court's goal is expediting the termination of litigation, the worst thing it can do is to extend an open-ended invitation to litigants to interrupt state proceedings with interlocutory visits to this Court.

I would therefore dismiss the writ because the judgment of the Supreme Court of Pennsylvania is not final.

---

the District Court's rejection of his assertion of executive privilege. As Judge Friendly explained, the rationale of that decision is unique to the Presidency and is "wholly inapplicable" to other government agents. See *National Super Suds, Inc.* v. *New York Mercantile Exchange*, 591 F. 2d 174, 177 (CA2 1979); see also *Newton* v. *National Broadcasting Co.*, 726 F. 2d 591 (CA9 1984); *United States* v. *Winner*, 641 F. 2d 825, 830 (CA10 1981); *In re Attorney General of the United States*, 596 F. 2d 58, 62 (CA2), cert. denied, 444 U. S. 903 (1979); but see *In re Grand Jury Proceedings (Wright II)*, 654 F. 2d 268, 270 (CA3), cert. denied, 454 U. S. 1098 (1981); *Branch* v. *Phillips Petroleum Co.*, 638 F. 2d 873, 877–879 (CA5 1981).