869 F.2d 594
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Charles Sidney LANGLEY, Petitioner-Appellant,
v.
David CHESTER, Superintendent; Attorney General of the
State of North Carolina, Respondent-Appellee.
 No. 87-6608.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 1, 1988.
Decided: Feb. 15, 1989.
 
 Gordon Widenhouse, for appellant.
 Richard Norwood League, Special Deputy Attorney General (Lacy H. Thornburg, Attorney General, Department of Justice, on brief), for appellees.
 Before DONALD RUSSELL, Circuit Judge, BUTZNER, Senior Circuit Judge, and JACKSON L. KISER, U.S. District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 The petitioner, Charles Sidney Langley, appeals the district court's dismissal of his petition for a writ of habeas corpus. Finding no error, we affirm.
 
 I.
 
 2
 On September 1, 1982, a jury sitting in the Superior Court of Nash County, North Carolina, convicted the petitioner of various arson-related crimes. Critical to the state's case linking the petitioner to the fires was the testimony of two key witnesses--Billy Ray and Thomas Immel. The presiding superior court judge sentenced the petitioner to a total of thirty-three years in prison.
 
 
 3
 Following his conviction, the petitioner pursued various state court remedies before filing a petition for a writ of habeas corpus. In his petition, Langley listed two grounds as a basis for relief from his conviction. First, Langley argued that the prosecution unconstitutionally failed to disclose evidence favorable to him. Specifically, Langley asserted that the prosecution did not reveal alleged discussions between Billy Ray and law enforcement officials regarding possible relocation money for Ray. Next, Langley asserted that the prosecution did not reveal that while awaiting trial, Billy Ray was allowed private contact visits with his girlfriend. Finally, Langley asserted that the prosecution did not reveal the prior criminal records of both Billy Ray and Thomas Immel.
 
 
 4
 The second ground for relief alleged by Langley in his petition was that the prosecution unconstitutionally failed to correct testimony known to be false. Specifically, Langley asserted that the prosecution did not correct Billy Ray's testimony that his truthful testimony was the only condition of his plea bargain, even though the prosecution allegedly allowed Ray contact visits with his girlfriend as well as relocation money. Next, Langley asserted that the prosecution did not correct Billy Ray's testimony that he was under arrest only for conspiracy even though Ray had pending assault charges. Finally, Langley asserted that the prosecution did not correct Thomas Immel's testimony that he had only one prior conviction when Immel had three other convictions.
 
 
 5
 In a report and recommendation filed on May 7, 1987, United States Magistrate Alexander B. Denson recommended that the district court dismiss Langley's petition in part, and conduct an evidentiary hearing on the remaining parts. United States District Judge W. Earl Britt reviewed the magistrate's recommendation and report. Judge Britt also conducted a line-by-line, word-by-word review of the transcript of Langley's trial. As a result of his thorough review, Judge Britt, in an order filed on August 12, 1987, concluded that even if all of Langley's allegations were true, that no reasonable probability existed that the result of Langley's trial would have been different and that no facts existed undermining confidence in the outcome of Langley's case. Thus, Judge Britt dismissed Langley's petition. Langley appealed, and we granted a Certificate of Probable Cause.
 
 II.
 
 6
 In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or punishment irrespective of the good faith or bad faith of the prosecution." The court later expanded this rule so that even if the defense has not made a specific Brady request, the prosecution still has a duty to disclose evidence that is both favorable and material. See United States v. Agurs, 427 U.S. 97, 107 (1976). The Court has concluded that evidence is material, whether or not the defense has made a specific Brady request, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987) [quoting U.S. v. Bagley, 473 U.S. 667, 682 (1985) ]. In Bagley, the Court reaffirmed that impeachment evidence, as well as exculpatory evidence, comes within the Brady rule because, as Chief Justice Warren stated in Napue v. Illinois, 360 U.S. 264, 269 (1959):
 
 
 7
 The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.
 
 
 8
 Moreover, the court has stated that a conviction obtained by the prosecutor's knowing use of perjured testimony, or through the prosecutor's knowing failure to correct false testimony, must be set aside if the testimony is material. Agurs, 427 U.S. at 103. Perjured testimony is considered material unless failure to disclose it would be harmless beyond a reasonable doubt. Bagley, 473 U.S. at 680.
 
 III.
 
 9
 In the case at bar, our first inquiry concerns the prosecution's alleged failure to disclose evidence that the petitioner could have used to impeach the two key prosecution witnesses--Billy Ray and Thomas Immel. For purposes of our analysis, we will assume that all of the petitioners' allegations are true.
 
 
 10
 Langley, citing our recent decision in McDowell v. Dixon, 858 F.2d 945 (4th Cir.1988), urges us to reverse the district court, arguing that the undisclosed evidence at issue should undermine our confidence in the outcome of his trial. It is illustrative that the petitioner refers us to the McDowell case because the facts present in McDowell are so clearly distinguishable from the petitioner's factual situation.
 
 
 11
 In McDowell, a North Carolina superior court convicted Ralph McDowell of first degree murder and felonious assault. Critical to the prosecution's case was the sole identification testimony of the surviving victim, Patsy Mason. Having exhausted his state court remedies, McDowell unsuccessfully petitioned the district court for a writ of habeas corpus. On appeal, we reversed the district court, holding that the nondisclosure of certain exculpatory evidence by the prosecution had denied the petitioner due process of law. Id. at 949.
 
 
 12
 The undisclosed evidence in McDowell concerned the identity of the petitioner, an unmistakably black male. Patsy Mason, the surviving victim and sole identification witness, had stated three hours after being attacked that her assailant had been white. Patsy subsequently identified her assailant as black, but the prosecution did not disclose to the defense Patsy's prior inconsistent identification. Finding that Patsy's prior identification was noncumulative and exculpatory evidence, we concluded that had the jury known of the undisclosed evidence, there was a reasonable probability that the outcome of McDowell's trial might have been different. Id. at 949-51.
 
 
 13
 In stark contrast to McDowell, however, is the factual situation in the instant appeal. The undisclosed evidence at issue concerns possible relocation money for Billy Ray, private contact visits for Ray while he was in custody awaiting trial, and the prior criminal records of both Ray and Thomas Immel. The record clearly indicates that the defense cross-examined both Ray and Immel on a number of matters, all designed to undermine the witnesses' credibility. The defense inquired about Ray's plea agreement. In response, Ray testified that the prosecution would drop all charges against him in exchange for Ray's testimony. The defense inquired about Ray's prior convictions. The defense also inquired about Ray's smoking marijuana while in jail. Finally, the defense elicited the testimony of Byrum Boles, who stated that Ray previously had told him that Ray was going to lie about Langley's involvement in the arson scheme so that Ray could obtain a favorable plea agreement.
 
 
 14
 Turning to Thomas Immel, the defense inquired about Immel's plea agreement. In response, Immel testified that the prosecution would drop all charges against him in return for Immel's testimony. The defense inquired about Immel's arrangement with Langley's insurance company where, in exchange for Immel's testimony, Langley's insurance company agreed to pay a number of Mrs. Immel's bad checks. The defense inquired about Immel's prior conviction for grand theft auto and subsequent prison time. The defense inquired about Immel's failure to return to prison in Virginia when he fled while on a work release program. The defense also inquired about Immel's questions to law enforcement officials regarding the witness relocation program. Finally, the defense elicited the testimony of Mary King, who stated that Immel previously had told her that Immel was going to lie about Langley's involvement in the arson scheme so that Immel could obtain a favorable plea agreement.
 
 
 15
 Both witnesses admitted on cross-examination that they were convicted felons, that they had lied in the past, and that they had ample incentive to lie on the stand. Moreover, two defense witnesses, Byrum Boles and Mary King, both put the witness' credibility directly at issue by stating that Ray and Immel, respectively, had stated they were going to lie about the petitioner's involvement in the underlying crime. In light of the plethora of impeachment evidence the defense arrayed against Ray and Immel, we have little difficulty in concluding that the additional undisclosed impeachment evidence is merely cumulative and does not undermine our confidence in the outcome of petitioner's trial.
 
 IV.
 
 16
 Similarly, regarding the petitioner's claim that the prosecution failed to correct false testimony, we also have little difficulty concluding that the prosecution's error is harmless beyond a reasonable doubt. The false testimony at issue concerns Ray's testimony regarding his plea agreement, Ray's testimony regarding his criminal record, and Immel's testimony regarding his criminal record. Though this portion of the petitioner's appeal is more troublesome than the prosecution's failure to disclose impeachment evidence, the wealth of impeachment evidence that the defense possessed and utilized against both Ray and Immel convinces us that the prosecution's failure to correct the witnesses' testimony is harmless beyond a reasonable doubt. Accordingly, the petitioner's conviction is
 
 
 17
 AFFIRMED.